## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **CAROLYN KNOX,** | ) |
| **On behalf of her minor grandson, J.D.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 4:18-CV-216-PLC** |
| | ) |
| **ST. LOUIS CITY SCHOOL DISTRICT,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Plaintiff Carolyn Knox (Grandmother) initiated this lawsuit seeking attorney fees and costs after the Administrative Hearing Commission (AHC) found that Defendant St. Louis City School District (the District) had denied her grandson J.D. (Student) a free appropriate public education (FAPE) in violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq.  [ECF No. 1]  In its answer, the District denied Grandmother's entitlement to fees and costs and counterclaimed for judicial review of the AHC's decision.  [ECF No. 14]  Both sides moved for judgment on the administrative record [ECF Nos. 59, 62] and summary judgment on Grandmother's complaint for attorney fees [ECF Nos. 59, 65]

### I.     Background

Student, who was born in July 2008, has the medical diagnoses of attention deficit hyperactivity disorder (ADHD) and disruptive mood dysregulation disorder.  Student attended Peabody Elementary School (Peabody) from August 2013 until March 2017.

Grandmother filed a due process complaint in February 2017, alleging that the District denied Student a FAPE and violated its child-find obligation by failing to initiate "a full and

individual initial evaluation" to determine Student's eligibility under the IDEA, despite evidence of a suspected disability.  [R. at 6][1]  Grandmother asked the District to (1) immediately evaluate Student to determine his eligibility under the IDEA, as well as (2) provide compensatory services, such as academic tutoring and counseling.  She later amended the due process complaint to allege that the District denied Student a FAPE and violated the IDEA's child-find obligation by failing to find Student eligible for special education services and failing to develop an individualized education plan (IEP) for Student until March 2017.  [R. at 26]

After a hearing, the AHC found that the District did not deny Student a FAPE in April 2015 when it determined that Student did not satisfy the eligibility criteria for Emotional Disturbance (ED), but it violated the IDEA's procedural requirements because it failed to consider whether Student satisfied the criteria for Other Health Impairment (OHI), a category that can qualify children with ADHD for special education services.  Next, the AHC found that the District violated its child-find obligation when it failed to reevaluate Student's IDEA eligibility after receiving a copy of his independent educational evaluation (IEE) in November 2016.

Grandmother filed a complaint in this Court for attorney fees claiming that she was the prevailing party in the administrative proceeding and therefore entitled to attorney fees pursuant to 20 U.S.C. § 1415(i)(3)(B).  The District counterclaimed, requesting that the Court reverse the portions of the AHC's decision that are adverse to the District and enter judgment in favor of the District on all claims.

## II.    Evidence Presented to the AHC

A.  Kindergarten (2014-2015 School Year)

---

[1] Throughout this Order, the Court refers to the record of proceedings before the Administrative Hearing Commission [ECF No. 35] by the abbreviation "R."

Student repeated kindergarten at Peabody during the 2014-2015 school year.[2]  Student exhibited disruptive behaviors throughout Fall 2014, including fighting with staff and other students, running from the classroom and the building, and throwing things.  Student was sent home early and suspended "numerous times" during this period.  [ECF No. 60-1 at ¶ 11]

In September 2014, Grandmother requested an IDEA evaluation for Student, and a Student Intervention Team (SIT) met later that month.[3]  The SIT determined that Student's "behavior is preventing him from learning," but decided to "track the times, duration and frequency it occurs, and if any learning is taking place."  [R. at 970]  The SIT scheduled another meeting for the following month.

In January 2015, Student's kindergarten teacher, Ms. Dubbs, emailed Peabody's school counselor, Ms. Harris, expressing concern that Student's behavior was escalating as he fell "further behind academically."  [R. at 974]  Ms. Dubbs inquired about the status of an IEP for Student and requested an SIT or review of documents (RED) meeting, as well as counseling or group therapy for Student.  [R. at 974]  Later that month, Student received a two-day suspension for threatening to stab Ms. Harris.  [R. at 976-77]

In early-February 2015, Peabody's principal emailed the District's special education process coordinator regarding Student's behavioral problems.  [R. at 978-79]  The principal wrote that, earlier in the day, Student threatened a student with a rock, threw a toy at another student, tried to elope from the building, yelled profanity, and masturbated in class.  [R. at 979]  On February 20, Peabody conducted an RED meeting as part of an initial eligibility evaluation.

---

[2] Student was a kindergartener at Peabody during the 2013-2014 school year, but he stopped attending when his mother, who was addicted to drugs, ceased to bring him to school.  In August 2014, the Missouri Children's Division placed Student and his three siblings with Grandmother.  Grandmother is Student's legal guardian.

[3] The SIT included the school counselor, the school social worker, and Student's kindergarten teacher.

In March 2015, Student began treatment with advanced practice nurse (APN) Gina Bufe at Mercy Clinic Child and Adolescent Psychiatry.  APN Bufe diagnosed Student with ADHD and prescribed Adderall, which Student began taking on March 27.[4]  The same day, Ms. Harris, Ms. Dubbs, Peabody's principal, the District's psychological examiner, and the school social worker met to consider Student's eligibility and decided to monitor Student's response to the medication and reconvene in April.

The District held Student's eligibility meeting on April 17, 2015 and issued an "Initial Psycho-educational Evaluation."  [R. at 1065-77]  The eligibility team concluded that:  (1) Student did not satisfy the eligibility criteria for a diagnosis of Intellectual Disability; (2) Student was not eligible for a diagnosis of Specific Learning Disability because his "achievement is commensurate with cognition"; (3) Student was able to "learn in an educational setting"; and (4) although Student "demonstrates inappropriate behaviors in the classroom, there is insufficient information at this time to warrant a diagnosis of Emotional Disorder."  [R. 1076]  The evaluation did not address whether Student satisfied the criteria for OHI.

B. First Grade (2015-2016 School Year)

Student's disciplinary records reveal that the "extreme" behaviors Student exhibited in kindergarten continued in first grade.  In September 2015, Student received a one-day suspension after he refused to sit down, chased a student around the room while cursing, threw a chair at a student, and ran from the classroom.  [R. at 909-10]  Later that month, Student punched two students in their faces.  [R. at 913]

On October 2, Student received a one-day suspension because he "launched himself" at a

---

[4] Because Student had an allergic reaction to Adderall, APN Bufe switched Student to Concerta in April 2015.  APN Bufe increased Student's Concerta dosage in August 2015 and, in October 2015, she added Abilify, an anti-psychotic medication used to treat aggression.

classmate who was "sitting quietly at her desk" and "punch[ed] her several times in the face and side of the head." [R. at 915-16]  A report from October 20, stated that Student pushed a chair at his teacher, Ms. Washington, and continuously eloped from the classroom and ran through the halls.  On November 9, Student fought with another student.  [R. at 917]

On December 7, 2015, Student "started running around hitting the other students," cursed and threw a chair at his teacher, "ran over to a little girl and smacked her in the face," ran out of the classroom and upon, his return, "started kicking and punching another female student[.]"  [R. at 920-21]   Three days later, Student was disciplined for using profanity during class and threatening to hit the teacher.  [R. at 922]  On December 16, Student began punching and kicking another child.  [R. at 923]  When Ms. Washington attempted to intervene, Student threw a chair at her, hitting her in the chest.  [Id.]  Student received a two-day suspension.  That same month, Dr. Liberati, began providing Student therapy at school, focusing on anger management and skills building.

In February 2016, at Ms. Washington's request, Student transferred to another teacher's first-grade classroom.  Student had a positive relationship with that teacher and demonstrated improvement in her classroom.  In April, the District's psychological examiner, informed the District's special education process coordinator that Student had made "great strides in his behavior" and, according to his new teacher, Ms. Lindsey, "there are times when [Student's] behavior is off task but [he] can be redirected."  [R. at 1042]  In May, Dr. Liberati closed Student's therapy citing Student's improvement.[5]

Despite the reported improvements in Student's behavior and academic performance during Spring 2016, he received a grade of "X", meaning "area of concern," in every subject

---

[5]  Student resumed therapy sessions with Dr. Liberati in October 2016.

except physical education.  [R. at 900-01]  Student's effort grades reflected "little or no effort" in

math and "minimal effort" in language and reading.  [Id.]   Student attended three days of

summer school but withdrew due to behavior problems.  [R. at 881]

C.  Second Grade (2016-2017 School Year)

During Fall 2016, Student's behavioral problems, including physical and verbal

aggression, destruction of property, elopement, and refusal to complete assignments, escalated.

Peabody staff implemented numerous behavioral interventions, all of which were ineffective.

In late-September 2016, Student underwent an IEE at Miriam Learning Center.[6]  [R. at

1081-1102]  In regard to Student's academic performance, the IEE concluded:

> [Student's] academic skills are severely depressed with skills at the
> kindergarten level across the board.  The WJ-IV yielded scores that were
> generally 1-2 years below his current grade placement.  Basic reading skills
> were Low (76); reading comprehension Low (70); reading fluency Very Low
> (67); math calculation skills Low (76); math problem solving Low Average
> (81); and written language Low Average (81).  The Gray Oral Reading
> quotient found rate, accuracy, fluency, and comprehension to be below the 1st
> grade level.  The overall quotient of 73 fell at the 4th percentile.  [Student] has
> a very limited sight word vocabulary.  He struggles so much to decode words
> that he misses the meaning of the passage.

[R. 1092]  As to Student's behavior, the IEE stated that Grandmother and Student's second grade

teacher, Ms. Burkins both "reported problems related to hyperactivity, aggression, conduct,

depression, attention, and withdrawal resulting in Behavioral Symptom Index scores of 79 and

99 in the 'Significant' range."  [Id.]  The IEE concluded:  "Both scales indicated significant

problems in multiple areas of executive function which support his current medical diagnosis of

ADHD, despite medical intervention."  [Id.]  The IEE also set forth twenty recommendations,

---

[6] A parent or guardian is entitled to an IEE, at the school district's expense, if he or she disagrees
with the school's evaluation.  20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b)(1).  Grandmother
sent the District a letter in March 2016, stating that she disagreed with the April 2015 eligibility
determination and requesting an IEE at the District's expense.  [R. at 1012]

including a functional behavioral assessment and a research-based early-intervention reading program.  [R. at 1093-94]

In November 2016, Ms. Harris received a copy of the IEE and forwarded it to Peabody's principal and the District's psychological examiner, Ms. Jefferson.  [R. at 322-23]  Ms. Jefferson did not review the IEE at that time because the school counselor informed her that Grandmother had not requested a new IDEA evaluation.  [R. at 538-39]

In early December 2016, Student was disciplined for repeatedly leaving his seat, disrupting other students, refusing to comply with the teacher's directives, fighting another student, and running from the classroom.  [R. at 938]  Five days later, Student left the building without permission, threw rocks at other students, entered other classrooms and disrupted instruction, removed items from another classroom, and urinated in the stairwell.  [R. at 939]

During this time period, therapist Dr. Liberati wrote a letter to the District, at the request of school counselor Ms. Harris, regarding Student's lack of progress in therapy.  Dr. Liberati reported that Student "continues to have intermittent explosive anger episodes, along with conduct difficulties."  [R. at 950]  Dr. Liberati concluded that "[o]verall, [Student] is unsuccessful in treatment and would benefit from more intensive services."  [Id.]  He recommended that Student "be placed into intensive therapeutic services for his behavior and anger management problems…. [Student] would benefit from a more restrictive environment to ensure his safety and access to intensive therapeutic services."  [Id.]

In mid-December, Student's teacher Ms. Burkins emailed Ms. Harris and the school social worker requesting "some guidance as to what to do with [Student] in my classroom" [7]  [R.

---

[7] Ms. Burkins explained that, earlier that afternoon, Student began roaming the classroom, knocking students' work off their desks and kicking over chairs.  When Ms. Burkins asked him to stop, he threw a chair "towards some students that [were] sitting at a table," yelled profanity at

at 941]  About one week later, in Ms. Harris's office, Student threw items, such as books and a trash can, and repeatedly threatened to stab Ms. Harris.  [R. at 942, 955]  Ms. Harris completed a risk screening worksheet and, based on its results, referred Student to the emergency room for further evaluation.  Student subsequently received three days' inpatient psychiatric treatment at DePaul Hospital.  [R. at 1458-56]

In early-January 2017, Ms. Burkins reported that Student ran from the classroom and, upon his return, refused to sit down, retrieved a pair of scissors from Ms. Burkins' desk, and began hitting another student's desk with the scissors.  When Ms. Burkins asked Student to give her the scissors, he "shoved the scissors very hard towards the student who was sitting at the desk."  [R. at 992]  Student also yelled profanity, threw various items, and repeatedly pushed Ms. Burkins.  Later that month, Student ran around the building evading staff until two staff members cornered him and escorted him to Ms. Harris's office.  In the office, Student threw various items at Ms. Harris and "dismantled the teacher's desk and tried to hit [her] with it."  [R. at 945]

In early-February 2017, Student underwent a four-day psychiatric hospitalization for "unsafe behavior, mood symptoms, and psychopharmacology review."  [R. at 1459]  During his hospital stay, Student was diagnosed with ADHD and disruptive mood dysregulation disorder.  [R. at 1461]

On February 13, the principal sent the District a "request for response" relating to Student because he "continues to elope from designated areas (daily), and display aggressive behavior towards staff members."  [R. at 998].  In the "request for response form," the principal stated that

---

Ms. Burkins, and continued knocking things to the floor and kicking tables.  [R. at 941]  Ms. Burkins wrote:  "[Student] has had meltdowns in class before, but never to the point where I had to have my entire class removed for their safety.  He is really disrupting the educational process, the culture of the classroom, and becoming a threat to the safety of my other students."  [R. at 941]  Ms. Burkins added that Student was "working below grade level and refuses to even attempt to complete any of the assignments."  [Id.]

Student's "behaviors are recurrent, violent and unsafe," and she listed twenty-two unsuccessful interventions implemented by the Peabody faculty and staff.[8]   [R. at 956-57]   In response, the District convened a Section 504 meeting on February 21 to determine whether Student qualified for accommodations under the Rehabilitation Act.   The 504 team determined that Plaintiff's ADHD substantially affected his learning and decided to assign Student a child-care attendant. [R. at 963]

On February 24, 2017, Grandmother filed her due process complaint against the District, requesting the District evaluate Student immediately to determine IDEA eligibility.[9]   Upon receipt of Grandmother's due process complaint, the District's "special education process coordinator for assessment and related services" requested an RED meeting for Student.   [R. at 1028]

On March 6, the RED team considered Student's IEE and the information provided by Peabody personnel and determined that Student had an Emotional Disturbance (ED) and was therefore eligible to receive special education services.   [R. at 1118]   On March 15, the District held an initial IEP meeting and placed Student at a "Private Separate School (Day) Facility."   [R. at 1124]   Pursuant to the IEP, Student began attending school at Great Circle on March 27, 2017.

### III.   Due Process Complaint and AHC Decision

In the amended due process complaint, Grandmother claimed that the District denied Student a FAPE and violated its child-find obligation "by failing to find [Student] eligible for special education services and failing to develop an IEP to provide FAPE until March 2017."   [R.

---

[8] The request for response was not part of the IDEA process.   At the AHC hearing, Ms. Harris explained that the request for response form is sent "down to the student support office here at the district to ask for interventions….It's like at the end of everything that we've exhausted, now we have nothing, what kind of help can you provide?"   [R. at 336]
[9] With leave of the AHC, Grandmother filed an amended due process complaint in July 2017. [R. at 97-121]

9

at 116]  More specifically, Grandmother argued that the District:  (1) denied Student a FAPE by failing to make the educational diagnoses of either OHI or ED when it evaluated Student's IDEA eligibility in April 2015; and (2)  violated its child-find obligation and denied Student a FAPE by failing to develop an IEP "at all times after April 2015 until it finally found him eligible under Emotional Disturbance and developed an IEP in March 2017."  [R. at 116, 120]  The District countered that it "ha[d] not denied [Student] a free appropriate public education and did not violate the IDEA's 'child find' obligation."  [R. at 129-31]

After a two-day hearing,[10] the AHC issued its decision in January 2018.  [ECF No. 1-1] In its decision, the AHC first considered whether the District denied Student a FAPE when, in April 2015, it did not assess Student for OHI and failed to diagnose him with either OHI or ED. The AHC rejected the District's argument that Plaintiff did not qualify for ED because his behavioral issues were "transient" and attributable to a "specific crisis or stressful experience." [Id. at 24]  Nevertheless, the AHC found that the District did not err in finding that Student did not meet the criteria for ED.  The AHC reasoned that Student did not satisfy the criteria for ED because he was only seven years old and had attended school for less than three semesters, and the State Plan[11] requires that the characteristics of ED present "to a marked degree and over an extended period of time."  [Id. at 25]

In regard to the District's failure to assess Student with OHI, the AHC found that

[10] The AHC held a two-day due process hearing in November 2017.  The following witnesses testified at the hearing:  Grandmother; Ms. Harris; Dr. Liberati; Ms. Jefferson, the District's psychological examiner; APN Bufe; Ms. Kennedy, the school psychological examiner from the Miriam Learning Center;  Ms. Miller-Seawood, Peabody's principal; Amy Konsewicz, Peabody's school social worker; Ms. Dubbs, Student's kindergarten teacher; and Molly Estes, licensed professional counselor at Great Circle.

[11]  The Missouri State Plan for Special Education ("State Plan") contains regulations implementing Part B of the IDEA.  The Missouri State Plan for Special Education, http://dese.mo.gov/special-education/compliance/laws-regulations.

Grandmother did not satisfy her burden to demonstrate that Student's ADHD adversely affected his education.  [Id.]  However, the AHC also found that, in failing to assess Plaintiff for an OHI, the District violated the IDEA's procedural requirements for initial evaluations.  The AHC further found that the procedural violation resulted in a denial of FAPE because it denied Grandmother the "opportunity to participate meaningfully" in the IEP process.  [Id. at 26-27] Given that an educational diagnosis of OHI "only requires that ADHD 'adversely affect'" a student's performance, Grandmother "could certainly have…provided additional information for consideration by the IEP team."  [Id. at 26-27]

Next, the AHC addressed Grandmother's claim that the District violated the IDEA's child-find requirement by failing to diagnose Student with ED or OHI before March 2017.  [Id. at 27]  The AHC rejected Grandmother's claim as to OHI because it found that "the record lacks sufficient information regarding ADHD generally or its specific manifestation in Student."  [Id. at 28]  Likewise, the AHC found that the District did not violate its child-find obligation by failing to diagnose Student with ED between April 2015 and November 2016 because, for a period of time in Spring 2016, Student's behavior improved.[12]

The AHC determined, however, that the District "violated its child find duties when it failed to reevaluate Student shortly after" receiving the IEE report from Miriam Learning Center in November 2016.  [Id.]  The AHC explained that, under the regulations, the District had a duty to consider the IEE in any decision made regarding FAPE. [Id. citing 34 C.F.R. § 300.502(c)(1)] In light of Student's escalating behavior in Fall 2016 (including a homicidal threat and psychiatric hospitalization) and the District's receipt of the IEE, which the District "later deemed

---

[12] The AHC explained:  "Either as a result of changing classrooms and having a teacher more attuned to Student's behaviors, starting Abilify, seeing Liberati, or some combination thereof, Student showed signs of progress that could reasonably excuse the District's failure to reevaluate Student."  [Id. at 29]

sufficient to support an educational diagnosis of ED," the AHC found that the District "ignored clear evidence of Student's ED and therefore violated the IDEA's child find requirement resulting in a denial of FAPE." [Id. at 29-30]

In summary, the AHC stated: "We grant Grand[mother]'s due process complaint on the grounds that the District failed to assess Student for OHI and failed to identify Student's ED in November 2016." [Id. at 30]  The AHC found that Student was entitled to "the equivalent of four school months of compensatory education in math and reading for the District's failure to evaluate him for ED upon receiving the IEE." [Id.]  More specifically, the AHC provided that the compensatory education "shall include…a functional behavior assessment, preferential seating, instruction in math and reading, and a research-based early intervention reading program" and "at least 88 hours of education in math and 88 hours in reading." [Id.]  With respect to the District's April 2015 procedural violation, the AHC ordered that the District "reconvene the IEP team to evaluate whether Student's ADHD adversely affects his education to determine whether he has an OHI." [Id.]

## IV.   Discussion

In its counterclaim to Grandmother's complaint for attorney fees and expenses under the IDEA, the District requested judicial review of the AHC's decision. [ECF No. 14]  Grandmother and the District filed cross-motions for judgment on the administrative record and summary judgment on the complaint for attorney fees. [ECF Nos. 59, 62, 65]  The Court will consider the motions for judgment on the administrative record before turning to the question of attorney fees.

### A.  Motions for Judgment on the Administrative Record

The District moves for judgment on the administrative record, urging the Court to "reverse those portions of the Commission's decision in favor of" Grandmother. [ECF No. 62]

The District argues that the AHC erred in finding the District committed a procedural violation when it failed to consider an OHI diagnosis during Student's April 2015 evaluation because:  (1) the amended due process complaint did not allege a procedural violation; and (2) the record did not support the AHC's finding that the District's failure to consider OHI denied Grandmother the "opportunity to meaningfully participate in the IEP process."  [ECF No. 64]  The District also contends the AHC erred in finding that the District violated its child-find obligation when it failed to evaluate Student after receiving the IEE in November 2016.  [Id.]  Finally, the District challenges the AHC's decision to award compensatory services to Student.  [ECF No. 71]

Grandmother moves for judgment on the administrative record, urging the Court to uphold the AHC decision.  [ECF No. 60]  In her motion, Grandmother asserts that the AHC properly found that the District denied Student a FAPE by failing to:  (1) evaluate Student for OHI in April 2015, thereby denying Grandmother her right to participate in the IEP process; and (2) timely re-evaluate Student's eligibility after receiving the IEE in November 2016.

1.   Standard of Review

The IDEA permits aggrieved parties to seek review of an administrative hearing panel's decision by bringing a civil action in federal court.  Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 654 (8th Cir. 1999) (citing 20 U.S.C. § 1415(i)(2)(A)).  In a motion for judgment on the record brought pursuant to the IDEA, a district court must review the state administrative record, hear additional evidence if requested, and grant such relief as it deems appropriate based on the preponderance of the evidence.  See 20 U.S.C. § 1415(i)(2)(B); C.J.N v. Minneapolis Pub. Sch., 323 F.3d 630, 636 (8th Cir. 2003).

A court reviews de novo whether a school district provided a child with a FAPE.  Albright v. Mountain Home School Dist., 926 F.3d 942, 948 (8th Cir. 2019).  At the same time,

the reviewing court must give "due weight" to the results of the administrative proceeding.  Id.

A court's "duty is to interpret and apply the law, not to substitute [its] own notions of sound

educational policy for those of the school authorities which [the court] review[s]."  Id. (quoting

Special Sch. Dist. No. 1, Minneapolis Pub. Sch. v. R.M.M. ex rel. O.M., 861 F.3d 769, 771-72

(8th Cir. 2017)).   The party challenging the outcome of the state administrative hearings has the

burden of proof.  E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley, 135 F.3d 566, 569

(8th Cir. 1998)

2.   Procedural Violation (April 2015)

The District challenges the AHC's finding that the District violated the IDEA's

procedural requirements when it failed to evaluate Student for OHI in April 2015 and thereby

denied him a FAPE.  More specifically, the District contends that, because Grandmother did not

allege a procedural violation that prevented her from meaningfully participating in the eligibility

evaluation process, it "was not a matter over which the Commission had jurisdiction."  [ECF No.

64 at 20]  Further, the District argues that, even if the claim was properly before the AHC, the

record does not support the finding of a parental participation violation because (1) the eligibility

team assessed Student's OHI eligibility and (2) there was no evidence that the District impeded

Grandmother's opportunity to participate in the process.  [Id. at 22-23]

Grandmother argues that the AHC correctly found that the District's failure to consider

OHI was a procedural violation of the IDEA.  Grandmother asserts that:  (1) she sufficiently

alleged a procedural violation in the amended due process complaint; and (2) the record

establishes that the District did not consider the educational diagnosis of OHI when it evaluated

Student's IDEA eligibility in April 2015.  [ECF No. 60 at 20-22]   Grandmother therefore urges

the Court to uphold the AHC's decision.

The IDEA requires all school districts receiving federal funds under the IDEA to provide all children with disabilities "a [FAPE] which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected." Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 (2009) (alteration in original) (quotation omitted). See also D.L. by Landon v. St. Louis City Sch. Dist., 950 F.3d 1057, 1064 (8th Cir. 2020) ("D.L. by Landon") ("Schools receiving federal funding must provide qualifying disabled children with a FAPE tailored to meet the unique needs of the disabled child."). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit from the instruction.'" Parrish v. Bentonville Sch. Dist., 896 F.3d 889, 894 (8th Cir. 2018) (quoting Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 188-89 (1982) ("Rowley")).

The IDEA creates a system of procedural protections to ensure that parents, teachers, and local education agencies work together to provide an appropriate education for children with disabilities. See 20 U.S.C. § 1415; Powers v. Indiana Dep't of Educ., Div. of Special Educ., 61 F.3d 552, 553 (7th Cir. 1995). The IDEA's procedural requirements protect "the rights of children with disabilities and their parents or guardians," 20 U.S.C. § 1400(c), by ensuring that "those individuals who have first-hand knowledge of the child's needs and who are most concerned about the child [are] involved in the IEP creation process." Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 891 (9th Cir. 2001). See also Rowley, 458 U.S. at 205-06 (discussing the significance of the IDEA's "elaborate and highly specific procedural safeguards"). A violation of the IDEA's procedural requirements denies a student a FAPE if it "result[s] in loss of educational opportunity or seriously deprive[s] parents of their participation

rights[.]"  Brown v. Des Moines Indep. Cmty. Sch. Dist., No. 4:05-CV-686, 2008 WL 11422059, at *7 (S.D. Iowa Dec. 5, 2008).  See also Lathrop R-II Sch. Dist. v. Gray, 611 F.3d 419, 424 (8th Cir. 2010).

As an initial matter, the Court considers the District's claim that the AHC erred in finding the District committed a procedural violation because "there was no allegation in the amended due process complaint that [Grandmother] had been denied the opportunity to participate in the evaluation."  [ECF No. 64 at 20]  Grandmother maintains that she sufficiently raised the issue of a procedural violation by alleging in her due process complaint that the District denied Student a FAPE when it failed to assess him for an OHI.  [ECF No. 73; see also ECF No. 60]

Pursuant to the IDEA, a party seeking judicial review must have exhausted "administrative remedies with regard to the issues upon which [he or she] seeks judicial review."  Blackmon, 198 F.3d at 655.  See also 20 U.S.C. § 1415(i)(2)(A) (stating that a party aggrieved by the due process hearing panel's decision has the right to bring a civil action "with respect to the complaint presented").  Any claim not "submit[ted] ... for the hearing panel's determination ... is barred unless an exception to the exhaustion rule applies."[13]  Blackmon, 198 F.3d at 656.  The purpose of the exhaustion requirement is "to allow[] for the exercise of discretion and educational expertise by state and local agencies…"  Handberry v. Thompson, 446 F.3d 335, 344 (2d Cir. 2006) (quotation omitted).

In support of its position that the AHC lacked authority to consider the parental participation claim, the District cites K.E. v. Indep. Sch. Dist. No. 15, No. 09-2433 JNE/FLN,

---

[13] "There are three exceptions to the exhaustion requirement in the IDEA context:  (1) futility; (2) inability of the administrative remedies to provide adequate relief; and (3) the establishment of an agency policy or practice of general applicability that is contrary to law."  Nelson v. Charles City Cmty. Sch. Dist., 900 F.3d 587, 593 (8th Cir. 2018) (internal quotations omitted). Grandmother does not argue that any of the exceptions to the exhaustion requirement apply.

2010 WL 2132072 (D. Minn. May 24, 2010), aff'd 647 F.3d 795 (8th Cir. 2011).  There, the court found that the administrative law judge (ALJ) incorrectly restated the plaintiff's claims to such an extent that they did not correspond to the claims set forth in the amended due process complaint.  Id. at 15-16.  As a result, the ALJ "decide[d] issues not raised by the parties." [14]  Id. at *16.  Significantly, in response to the school district's motion for judgment on the administrative record, the plaintiff did "not identify any allegations in her amended due process complaint that correspond to the restated issues."  Id.  The court reversed the ALJ's decision insofar as it found that the school district committed errors that the plaintiff did not identify in the amended due process complaint.  Id.

The instant case is distinguishable because the amended due process complaint alleged the procedural violation at issue here – namely, the District's failure to assess Student for OHI. In the amended due process complaint, Grandmother claimed that, despite ample evidence that Student satisfied the criteria for OHI, the District "failed to appropriately consider th[is] eligibility categor[y.]"  [R. at 116, 118]  Grandmother further argued that "since the District should have found [Student] eligible but failed to do so, the District denied him a FAPE."  [Id. at 120]  The AHC agreed that the District "did not assess Student for OHI by considering whether his ADHD adversely affected his education" and concluded that "[t]his omission constitutes a procedural violation of the IDEA initial evaluation requirements."  [ECF No. 1-1 at 26]  Cf. Blackmon, 198 F.3d at 655 (district court erred in finding that school district deprived the parents of their procedural rights because parents expressly waived any procedural claims at the due process hearing).

---

[14] For example, the ALJ expanded a claim that the district disregarded recommendations made by the student's treating psychiatrist to allege that the district disregarded two IEEs and information provided by the student's parents.  K.E., 2010 WL 2132072, at *15-16.

Having found that the District violated the IDEA's procedural requirements, the AHC considered whether this procedural violation resulted in a denial of FAPE.  As previously discussed, a procedural violation results in a denial of FAPE if it either:  (1) causes the loss of educational opportunity; or (2) seriously deprives parents of their participation rights.  See Lathrop R-II Sch. Dist., 611 F.3d at 424.  Because the question of parental participation is a factor courts consider in the course of the IDEA procedural violation analysis, Grandmother sufficiently raised the issue when she alleged that the District's failure to evaluate Student for OHI denied him a FAPE.[15]  The Court therefore finds that the AHC did not err in considering the issues of procedural and parental-participation violations because Grandmother alleged that the District's failure to assess Student for OHI denied him a FAPE.

The District contends that, even if this issue was properly before the AHC, the AHC erred in finding it violated the IDEA's procedural requirements by failing to assess Student's OHI eligibility in April 2015.  The District acknowledges that the April 2015 evaluation report did not analyze the OHI criteria, but it argues Student "was assessed with respect to OHI eligibility" because "information was gathered regarding the impact of [Student's] ADHD[.]" [ECF No. 64 at 22]  Grandmother counters that the "District's allegation that OHI was discussed by the eligibility team in April 2015 has no basis in the record."  [ECF No. 73 at 5]

To be eligible for special education services under the IDEA, a student must first be a "child with a disability" as defined in 20 U.S.C. § 1401(3)(A).  Indep. Sch. Dist. No. 283 v. E.M.D.H., 960 F.3d 1073, 1080 (8th Cir. 2020).  The statute recognizes thirteen categories of

---

[15] See, e.g., C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 78 (2d Cir. 2014) (arguments not directly raised in the due process complaint are not necessarily foreclosed so long as:  (1) the due process complaint "provided fair notice" to the school district of the argument at issue; (2) the commission "reached the issue on the merits, giving [the district court] a record for review"; or (3) the argument goes to "the heart of th[e] dispute.")

IDEA-eligible disabilities, including OHI.  Hansen v. rel. J.H. v. Republic R-III Sch. Dist., 632 F.3d 1024, 1026 (8th Cir. 2011).  OHI means "having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment" that:  (1) "is due to chronic or acute health problems such as … *attention deficit hyperactivity disorder*.…"; and (2) "adversely affects a child's educational performance."[16]  34 C.F.R. § 300.8(c)(9) (emphasis added).  See also E.M.D.H., 960 F.3d at 1081; Hansen, 632 F.3d at 1027.

The first step in determining whether a child is eligible for special education services under the IDEA is to provide a child who is suspected of having a disability with an appropriate evaluation.  See 34 C.F.R. § 300.8(a)(1)-(2).  Either a child's parent or guardian or the school district "may initiate a request for an initial evaluation to determine if the child is a child with a disability."  20 U.S.C. § 1414(a)(1)(B).  Importantly, the IDEA requires that the school district "ensure that ... the child is assessed in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B).

Student was diagnosed with ADHD in March 2015.  In April 2015, the eligibility team completed a fourteen-page "Initial Psycho-educational Report."  [R. at 1064-77]  The report contained:  summaries of the information collected at the February 2015 RED meeting; behavioral observations; and results of various tests including, among others, the  Behavior Assessment System for Children-Second Edition (BASC-2), Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV), and the Young Children's Achievement Test (YCAT).

---

[16] Pursuant to the State Plan, a child displays an OHI when:  (1) "[a] health impairment has been diagnosed by a licensed physician, licensed psychologist, licensed professional counselor, licensed clinical social worker, or school psychologist"; and (2) "[t]he health impairment adversely affects the child's educational performance."  Missouri State Plan for Special Education, Regulation III(B).

The eligibility team concluded:

> [Student's] intellectual functioning is in the Low Average range on the WISC-IV (FSIQ=83) with ability being evenly developed.  Achievement in all areas is at grade level and near expectation relative to cognition.  Rating scales completed by [Student's kindergarten teacher] and [Grandmother] suggest there are some concerns in the areas of Hyperactivity, Aggression, and Conduct Problems in the learning environment….

[Tr. at 1076]

The evaluation report considered the eligibility criteria and concluded that, based on the results of the evaluation, Student did not have an intellectual disability, which required intellectual functioning "two or more standard deviations below the mean and adaptive behavior [that] is commensurate with intellectual functioning."  [R. at 1076]  Next, the evaluation report stated that Student was not eligible for a diagnosis of specific learning disability because his "achievement [was] commensurate with cognition….Although [Student] does have a diagnosis of ADHD, he has the ability to learn in a[n] educational setting."  [Id.]   Finally, the evaluation report concluded that there was insufficient evidence to diagnose Student with an emotional disorder and Student did not have a language impairment because his language "score [was] commensurate with cognitive ability."  [Id.] The report did not reference or analyze the OHI criteria, and the District admitted that "OHI was not considered."  [ECF Nos. 60-1 at ¶ 23, 78 at ¶23]

The District argues that, despite the absence of a formal OHI analysis, Student "was assessed with respect to OHI eligibility" because the District gathered information about the impact of Student's ADHD in that:  (1) the eligibility team discussed the effect of Student's medications on his behavior; and (2) the BASC-2 provided information relating to the impact of

ADHD.[17]   [ECF No. 64 at 22]

Contrary to the District's argument, the record contains no evidence that the eligibility team discussed the effects of Student's medications on his behavior at the April 2015 meeting. The April 2015 evaluation report stated that Student had a medical diagnosis of ADHD and began taking Adderall in March 2015, but it did not mention the effects of Student's medication on his behavior.   In regard to the results of the BASC-2 completed by Grandmother and Student's kindergarten teacher, the evaluation did not discuss which areas of concern, if any, were attributable to Student's ADHD and how those problems affected Plaintiff's educational performance.   Simply collecting evidence potentially related to a student's ADHD does not demonstrate that the school district "assessed [the student] in all areas of suspected disability."[18]

Finally, the District argues that the AHC's finding that the procedural violation denied Grandmother the right to participate was "based solely on speculation about what [Grandmother] 'could certainly have' done."   [ECF No. 64 at 22]   The Court finds, however, that in light of Student's ADHD diagnosis and history of disruptive behavior and poor academic performance, the AHC's conclusion did not require speculation.[19]   The AHC reasonably determined that, if the

---

[17] According to the evaluation report, the BASC-2 is a "general rating scale designed to assess emotional and behavioral characteristics in a variety of areas including externalizing (acting-out, disruptive), internalizing (affect, emotional distress), and adaptive (positive, pro-social) behavioral patterns."  [R. at 1067]  Grandmother and Student's kindergarten teacher, Ms. Dubbs, completed the BASC-2 in March 2015.  [R. at 1068]  Grandmother's and Ms. Dubbs' scores placed Student in the "clinically significant" range in the areas of hyperactivity, aggression, attention problems, depression, and atypicality.  [R. at 1069]

[18] The Court also notes that the District's psychological examiner testified at the AHC hearing that she noted ADHD in the evaluation report, but she could not recall why she did not analyze OHI.  [R. at 524]

[19] Indeed, the evaluation report stated that Student's kindergarten teacher reported:  "[Student] uses profanity, hits with belts, and will throw objects.  [Student] is considered to be a bully in the classroom.  He has difficulty … interacting with peers and making friends.  [Student] previously had attention concerns with running out of the classroom."  [R. at 1065]  Likewise, according to the evaluation report, Grandmother expressed "more than a mild concern" about the following

District had explored the question of whether Student's ADHD adversely affected his educational performance, Grandmother would have been able to provide insight into this issue. See E.M.D.H., 960 F.3d at 1081, 1082 (school district failed to properly evaluate the student for OHI where the "preponderance of the evidence in the administrative record" showed that the student "suffers from 'limited … vitality' and 'a heightened alertness to environmental stimuli' that are 'due to chronic or acute health problems,' including ADHD, all of which are symptoms of 'other health impairments'"); Hansen, 632 F.3d at 1027-28 (student with ADHD met the eligibility requirements for OHI where father presented evidence that students' impulsivity and inattention adversely affected his educational performance and the district "fail[ed] to cite any evidence in the record that ADHD [did] not adversely affect" his educational performance).

The AHC did not err in finding that the District prevented Grandmother from fully participating in the IDEA process when, without considering the OHI criteria, it determined that Student was not eligible for special education.  See Indep. Sch. Dist. No. 413, Marshall, v. H.M.J. ex rel. A.J., M.N., 123 F.Supp.3d 1100, 1111 (D. Minn. 2015) (failure to consider the "other health disability" criteria prevented parents from fully participating in the process).  As the AHC explained in its decision, if the District had properly evaluated Student for OHI, Grandmother "could certainly have participated [] and provided additional information for the IEP team."  [ECF No. 1-1 at 26-27]  The Court finds that the administrative record supports the AHC's ruling that the District failed to evaluate Student for OHI and this procedural violation

---

behaviors:   "yelling out during class, hitting other students, does not remain in seat/line/classroom, defies authority, curses, stands on tables/chairs, extremely hyperactive with short attention span, and inappropriate sexual behaviors during class."  [R. at 1066]  Consistent with Grandmother's and the teacher's observations, the examiners noted that, during testing, Student was "at times…uncooperative and had to be redirected," "was very impulsive and appeared antsy and distracted during testing," and "wander[ed] around the testing room or crawl[ed] on the floor."  [R. at 1067, 1074]

resulted in a denial of FAPE.

### 3.   Child-Find Violation (November 2016)

The District claims the AHC erred in finding that the District violated its child-find obligation by failing to evaluate Student after receiving the IEE in November 2016.  [ECF No. 64]  More specifically, the District argues that the AHC erred in:  (1) finding that the IEE was the sole basis for the District's eligibility determination in March 2017; (2) failing to consider the evidence "in the context of [Student's] life at the time"; and (3) failing to consider the IDEA's evaluation timelines.  Grandmother urges the Court to uphold the AHC's determination because "ample evidence was presented at [the] hearing to support the AHC's finding that the District denied [Student] a FAPE beginning in November 2016.  [ECF No. 60]

"In order that all children with disabilities may receive a FAPE, the IDEA imposes a 'child find' obligation on school districts."   Indep. Sch. Dist. No. 283 v. E.M.D.H. by and through L.H., 357 F.Supp.3d 876, 888 (D. Minn. 2019) (citing 20 U.S.C. § 1412(a)(3)) (aff'd in relevant part E.M.D.H., 960 F.3d at 1083).  Pursuant to this obligation, districts have a duty to ensure that:

> All children with disabilities residing in the State ... regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).  This provision imposes an affirmative duty on school districts to "identify, locate, and evaluate all children with disabilities … to ensure that they receive needed special-education services."   Forest Grove Sch. Dist., 557 U.S. at 245 (internal quotation marks and brackets omitted).

Once a child is identified as potentially having a disability, the school district "shall

conduct a full and individual initial evaluation" to determine whether the child has a disability. 20 U.S.C. § 1414(a)(1)(A).  "An unreasonable delay in complying with this duty 'may constitute a procedural violation of the IDEA.'"  Krawietz by Parker v. Galveston Indep. Sch. Dist., 900 F.3d 673, 676 (5th Cir. 2018) (quoting D.K. v. Abington Sch. Dist., 696 F.3d 233, 249-50 (3d Cir. 2012)).

In this case, Grandmother informed the District in March 2016 that she did not agree with its IDEA eligibility determination and requested an IEE.  When  a parent or guardian "obtains an [IEE] at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation … [m]ust be considered by the public agency … in any decision made with respect to the provision of FAPE to the child[.]"  34 C.F.R. § 300.502(c)(1). See also Dallas Indep. Sch. Dist. v. Woody, 865 F.3d 303, 317 (5th Cir. 2017) (failure to reconvene IEP team to consider IEE resulted in denial of FAPE).

The IEE, completed by the Miriam Learning Center in September 2016, revealed that Student's "academic skills are severely depressed with skills at the kindergarten level across the board."  [R. at 1092]  The IEE evaluated Student in the areas of cognition, academic achievement, basic reading, social/emotional behavior, and executive functioning.  According to the IEE, Student's reading ability ranked in the "poor" range, with an overall score in the 4th percentile.  The Stanford-Binet Intelligence Scales Fifth Edition showed that Student's full-scale IQ score was 88, with significant scatter among the five subtests due to "inconsistent visual and auditory attention to details."  [Id.]  The IEE also analyzed the results of BASC-3 scales completed by Grandmother and Student's second-grade teacher, who "both reported problems related to hyperactivity, aggression, conduct, depression, attention, and withdrawal resulting in Behavior Symptom Index scores of 79 to 99 in the 'Significant' range."  [Id.]

24

Grandmother provided the IEE to Peabody's school counselor, Ms. Harris, in November 2016, and Ms. Harris forwarded it to the principal and the District's psychological examiner.[20] The District does not dispute that, despite its receipt of the IEE in November 2016, the District neither formally reviewed the IEE nor scheduled a meeting to consider the IEE until March 6, 2017, the date the District convened a RED meeting in response to Grandmother's due process complaint.  [ECF Nos. 60-1 at ¶ 45, 78 at ¶ 45]

In its decision, the AHC found that the District violated its child-find obligation when it received the IEE in November 2016 but failed to reevaluate Student.  The AHC reasoned that the IEE, which served as the basis for Student's March 2017 ED diagnosis and eligibility determination, in combination with Student's escalating behavioral problems,[21] placed the District on notice that Student suffered a disability.  The AHC concluded:  "Given the clear sufficiency the District found in the IEE report and the behavioral cues Student presented, we find that [the] District ignored clear evidence of Student's ED and therefore violated the IDEA's child find requirement resulting in a denial of FAPE."  [Id. at 29-30]

The District challenges the AHC's suggestion that the District based its March 2017 eligibility determination solely on the IEE.  The District contends:  "While it is true that the eligibility team determined on March 6, 2017, that it was not necessary to conduct any additional assessments of [Student], it is not true that the team relied solely on information contained in the IEE to reach its conclusion[.]"  [ECF No. 64 at 24]  According to the District, "key information … when making the eligibility determination in 2017 was information provided by school

---

[20] At the AHC hearing, the District's psychological examiner stated that she did not review the IEE because she was told that Grandmother had not requested a new IDEA evaluation.  [R. at 257]

[21] Student's escalating behavior problems included "a homicidal threat that resulted in Student's hospitalization and repeated incidents of eloping, destroying items in the school, fighting classmates, throwing rocks at classmates, and other threatening behaviors."  [ECF No. 1-1 at 29]

personnel[.]"  [Id.]

Plaintiff acknowledges that the eligibility team relied on anecdotal information, as well as the IEE, when completing the March 2017 eligibility determination and evaluation report. Plaintiff argues, however, that this fact does not excuse the District's failure to consider the IEE and initiate the evaluation process before March 2017.  The Court agrees.  Even if the AHC overstated the IEE's eligibility team's reliance on the IEE, the fact remains that, under the regulations, a school district "must" consider an IEE and the District failed to do so until Grandmother filed the due process complaint months later.  The IEE, in combination with Student's academic and disciplinary records, triggered the District's duty to evaluate Student and determine whether he qualified for special education services under the IDEA.

Next, the District claims that the AHC erred in finding that the District violated the IDEA's child-find obligation because the AHC "failed to consider the evidence in the context of [Student's] life at the time."[22]  [ECF No. 64 at 25]  More specifically, the District argues that the death of Student's uncle in August 2016 was of "critical importance … to the question of [Student's] IDEA eligibility" because:  (1) the end of Student's previous school year was "relatively successful"; and (2) under the State Plan, children with "transient symptoms due to a specific crisis or stressful experience are not considered to have an emotional disturbance." [23] [ECF No. 64 at 26 (quoting State Plan at 26)]  Grandmother counters that, given the District's failure to raise the issue of the uncle's death when determining Student's eligibility in March

_____

[22] Neither party challenges the appropriateness of the March 2017 determination that Student satisfied the criteria for ED.

[23] Additionally, the State Plan provides that "the characteristic(s) [of an emotional disturbance] must have existed to a marked degree and over an extended period of time.  In most cases, an extended period of time would range from two (2) through nine (9) months."  State Plan, Reg. III, at 26.  See also 34 C.F.R. § 300.8(c)(4)(i) (to qualify as a child with an ED, the child must exhibit characteristics of ED "over a long period of time").

2017, "it is disingenuous to expect the AHC to do so."  [ECF No. 73 at 10]

The District identifies no evidence in the record supporting the District's suggestion that it did not review the IEE and evaluate Student until March 2017 because it attributed Student's academic and behavioral problems to his uncle's death.   To the contrary, the District's psychological examiner testified before the AHC that the District did not review the IEE in November 2016 because Grandmother had not formally requested another evaluation. Furthermore, the record establishes that, but for a brief period of improvement in Spring 2016, Student's characteristics of ED existed to a marked degree and for an extended period of time. Under these circumstances, the Court finds that the AHC did not err in failing to consider Student's life events when it determined that the District violated its child-find obligation.

Finally, the District argues that, even if it had reason to suspect that Student had an IDEA disability and a corresponding obligation to initiate the evaluation process, the District acted within the timelines provided in the State Plan.  According to the District, the State Plan provides a school district "120 days from the date of a referral to complete an evaluation and to develop an initial IEP."  [ECF No. 64 at 26]  The District states:  "Taking into consideration days when school was not in session … the District completed an initial IEP for [Student] within the 120-day timeline."[24]  [Id. at 27]  In response, Grandmother argues that, even if the Court considered the District's "120-day timeline argument, it does not support the District's contention that it considered the IEE within a reasonable time."  [ECF No. 73 at 12]

Pursuant to the State Plan, a school district "shall provide the parent with a Notice of Intent to Evaluate as soon as possible, but within thirty (30) calendar days of the date of referral

---

[24] With its motion for judgment on the administrative record, the District submitted a copy of its 2016-2017 school calendar.   [ECF No. 64-1]   Plaintiff objects to the introduction of new evidence at this stage of the litigation without "a solid justification."  Because the Court does not apply the 120-day timeline, it will not resolve this issue.

for evaluation."  State Plan, Regulation III, at 34.  The school district must complete the evaluation and render an eligibility decision "within sixty (60) calendar days following consent or notice[.]"  Id.  If the school district determines that the student needs special education and related services, it must "ensure that a meeting to develop an IEP is conducted within thirty (30) days…."  State Plan, Regulation IV, at 53.

The issue in this case is not only the amount of time that elapsed between the referral (receipt of the IEE)[25] and the IEP meeting, but the fact that the District did not, upon receiving the IEE, initiate the process required by the regulations and the State Plan.  Despite receiving the IEE In November 2016, the District took no appreciable steps toward complying with its child-find obligation until Grandmother filed the due process complaint in February 2017.  See Krawietz, 900 F.3d at 677 (four-month delay in conducting evaluation was unreasonable because, during that time period, the school made no effort to comply with the IDEA and did not seek consent to conduct the evaluation until student's family requested a due process hearing).  Based on the above, the Court concludes that the AHC did not err in finding that the District violated its child-find obligation resulting in a denial of FAPE.

### 4.  Compensatory services

In response to Grandmother's motion for judgment on the administrative record, the District argues that the record did not support the AHC's award of compensatory services.  [ECF No. 71 at 14]  More specifically, the District argues that the testimony of Ms. Kennedy, Miriam Learning Center's school psychological examiner who completed Student's IEE, "showed that she had virtually no basis for connecting [Student's] delays in reading and math to the limited

---

[25] See e.g., Hupp v. Switzerland of Ohio Local Sch. Dist., 912 F.Supp.2d 572, 590-91 (S.D. Ohio 2012) (letter from the student's psychologist was the "triggering event in terms of conducting an initial evaluation").

failure by the District to timely provide a [FAPE] to [Student.]"  [Id.]   Notably, the District provides no authority supporting its position that, to receive an award of compensatory services, a student must demonstrate that the District's IDEA violations caused his or her academic delays.   Grandmother asserts that Ms. Kennedy's expert testimony and the IEE provided a sufficient basis to support the compensatory services award.  [ECF No. 76 at 12]

"[O]rdering compensatory educational services is appropriate relief under the IDEA for the denial of a FAPE because such relief is necessary to secure the child's right to a FAPE." Reese ex rel. Reese v. Bd. of Educ. of Bismarck R-V Sch. Dist., 225 F.Supp.2d 1149, 1164 (E.D. Mo. 2002) (citing Miener by and through Miener v. State of Mo., 800 F.2d 749, 754 (8th Cir. 1986)).  "A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." D.K., 696 F.3d at 249 (quotation omitted).

The AHC awarded Student "the equivalent to four months of compensatory education in math and reading for failure to evaluate him for ED upon receiving the IEE."  [ECF No. 1-1 at 30]  The award of four months' compensatory services represents the period of time, beginning in November 2016, when the District denied Student a FAPE.  The Court finds this award is an appropriate remedy in this matter.  See N.L. ex rel. Lordo v. Special Sch. Dist. of St. Louis Cty., No. 4:08-CV-1804 CEJ, 2010 WL 1170044, at *13 (E.D. Mo. Mar. 23, 2010).

## B. Motions for Summary Judgment on Grandmother's Complaint for Attorney Fees

Both parties move for summary judgment on Grandmother's complaint for attorney fees. Grandmother claims that she is entitled to attorney fees and costs because she was the

"prevailing party" in the AHC proceeding.[26]  [ECF No. 60]   In her complaint for attorney fees

and costs, Grandmother seeks compensation for counsel's representation of Student at the

administrative level and time spent preparing the fee request.[27]  [ECF No. 1]  More specifically,

Grandmother requests an award based on 376.4 hours of attorney time[28] at the rate of $300.00

per hour, plus costs of $1,169.95[29], for a total of $114,089.95.   In her motion for summary

judgment, Grandmother requests an additional $48,090 for 160.3 hours spent litigating the case

in this Court.  [ECF No. 60]

The District contests both Grandmother's right to a fee award and the amount requested.

In its motion for summary judgment, the District asserts that Grandmother is not entitled to

attorney fees because she unreasonably protracted resolution of the matter by filing the due

process complaint before requesting that the District reevaluate Student's IDEA eligibility.

[ECF No. 66]   In its response to Grandmother's motion for summary judgment, the District

---

[26] In the WHEREFORE clause of her complaint for attorney fees, Grandmother also requests "prejudgment interest associated with bringing this action[.]"   [ECF No. 1]   However, Grandmother pleaded neither allegations nor claims in the complaint to support an award of prejudgment interest for attorney fees.  See Peitzman v. City of Illmo, 141 F.2d 956, 962 (8th Cir. 1944) ("[T]he prayer for relief is in fact no part of the claim or cause of action."). Nor did Grandmother present any legal authority or argument to support such an award.  The Eighth Circuit has not determined whether prejudgment interest for attorney fees is available under the IDEA and, as other districts have noted, this remains an "open question."  See T.B. v. San Diego Unified Sch. Dist., 293 F.Supp.3d 1177, 1207 (S.D. Cal. 2018); McAllister v. District of Columbia, 160 F.Supp.3d 273, 277 n.1 (D. D.C. 2016).  But see Williams by and through Williams v. Fulton Cty. Sch. Dist., 717 Fed.Appx. 913, 918 (11th Cir. 2017) (IDEA does not provide prejudgment interest for attorney fees because it allows reasonable attorney fees "as part of the costs," 20 U.S.C. § 1415(i)(3)(B)(i), and the United States Supreme Court considers prejudgment interest damages rather than costs).  Because Grandmother makes no argument and cites no authority for the proposition that she could or should recover interest under the IDEA, the Court does not address this request.

[27] "Time spent preparing fee applications is generally compensable[.]"  El-Tabech v. Clarke, 616 F.3d 834, 843-44 (8th Cir. 2010).

[28] Margaret LaMore requests compensation for 264 hours, and Michelle Weltman requests compensation for 112.4 hours.  [ECF Nos. 1, 1-2]

[29] The District does not contest the amount of costs sought by Grandmother.

argues that Grandmother was not the prevailing party because the relief the AHC awarded "did not materially alter the relationship between the parties by modifying the District's behavior in a way that benefited [Student]" and Grandmother "did not receive most of the relief she sought." [ECF No. 71 at 3, 5]  The District further argues, in the alternative, that the Court should reduce the Grandmother's fee award because her counsel's hourly rates and hours worked on this matter were excessive.  [Id. at 7-9]

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-movant must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 792 (8th Cir. 2012).  A party moving for summary judgment on legal fees under the IDEA must demonstrate prevailing party status and the reasonableness of the fees requested in terms of hours spent and hourly rate.  See 20 U.S.C. § 1415(i)(3).

1.  Unreasonably Protracted Resolution

The Court first considers the District's claim that it is entitled to summary judgment on Grandmother's complaint for attorney fees because Grandmother unreasonably protracted resolution of the matter by failing to request the District evaluate Student before filing the due process complaint. [ECF No. 66]  The District maintains that Grandmother denied it notice and an opportunity to resolve the dispute and suggests that Grandmother rejected the District's settlement offer "solely because of a desire … to obtain attorney's fees."  [Id. at 3]  In response,

Grandmother asserts that the District "was well aware of [Grandmother's] concerns and had every opportunity to remedy those concerns prior to the filing of the Due Process Complaint." [ECF No. 72 at 3]  She further asserts "a parent is substantially justified in rejecting a school district's proposed settlement offer … if it does not include reasonable attorney's fees." [Id. at 5]

Section 1415(i)(3)(B) governs the award of attorney fees in actions to enforce IDEA rights.  The statute provides, in relevant part:  "… the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability…." 20 U.S.C. § 1415(i)(3)(B)(i).  However, "whenever the court finds that the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy … the court shall reduce, accordingly, the amount of the attorneys' fees awarded…." 20 U.S.C. § 1415(i)(3)(F)(i).  See also Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1030 (8th Cir. 2002).

The Eighth Circuit has recognized the "conflicting policy concerns [that] must be carefully balanced" when awarding attorney fees under the IDEA.  Johnson v. Bismarck Pub. Sch. Dist., 949 F.2d 1000, 1003 (8th Cir. 1991).  "On the one hand, procedural safeguards, including those ensuring meaningful parent participation in the decision-making process, are a major component of [the IDEA]." Id. at 1004.  "On the other hand, … needless litigation frustrates the [IDEA's] objectives by fostering delay, exacerbating ill-will among parties who should cooperate in educating the handicapped child, and wasting the resources of all concerned." Id.  Therefore, the Eighth Circuit stated that a school district "should be [put] on notice of disagreements and given an opportunity to make a voluntary decision to change or alter the educational placement of a handicapped child" and litigation should not be "continued…in an extensive and expansive fashion after… plaintiffs [achieve] most, if not all, of the substantial

results they seek." Id. (alteration in original) (internal quotations omitted).

In support of its argument that Grandmother is not entitled to attorney fees, the District relies on Johnson, 949 F.2d 1000.  In that case, after the school district implemented an IEP for the student, the parent became "upset about the adequacy of [the student's] educational services and the [school district's] responsiveness to her concerns."  Id. at 1001.  The school district demonstrated a willingness to revisit the IEP, but the parent and her attorney failed to participate in the IEP meetings and, without communicating to the district the type of relief the parent desired, filed a due process complaint.  Id. at 1002.  After the parties entered a consent agreement, the district court denied the parent's complaint for attorney fees because "neither [the parent] nor her attorney made an effort to resolve the matter or articulate [her] requests to the [school district] prior to filing the due process complaint."  Id. at 1002.  In affirming the denial of attorney fees, the Eighth Circuit noted that the district court "was in the best position to evaluate" whether the school district "had been recalcitrant in recognizing [the parent's] rights until her attorney appeared on the scene _and_ filed the due process complaint, or whether the attorney frustrated the statute's purpose by withholding efforts at meaningful cooperation until formal litigation was commenced."  Id. at 1004 (emphasis in original).

Unlike the parent in Johnson, Grandmother did not withhold efforts at meaningful cooperation.  Rather, this case resembles the alternative scenario recognized in Johnson, where the District was "recalcitrant in recognizing" Grandmother's rights until her attorneys filed a due process complaint.  Because Grandmother did not unreasonably protract the final resolution by filing the due process complaint, the Court denies the District's motion for summary judgment.

2.  Prevailing Party

Turning to Grandmother's motion for summary judgment, the Court first must determine

33

whether Grandmother was the prevailing party at the administrative level.  Grandmother asserts that she is the prevailing party because "the AHC order for compensatory services and other relief materially altered the relationship between the parties and directly benefited [Student]."  [ECF No. 60 at 7]  In response, the District argues Grandmother was not the prevailing party because:  (1) Student had not accessed the compensatory services; (2) Grandmother never requested a functional behavioral assessment and she did not materially benefit from the AHC's order to convene an IEP meeting; and (3) Grandmother did not receive most of the relief she sought.  [ECF No. 71]

The IDEA permits a court, in its discretion, to award reasonable attorney fees as part of the costs to "a prevailing party who is the parent of a child with a disability."[30] 20 U.S.C. § 1415(i)(3)(B)(i).  "A litigant is a 'prevailing party' if he obtains 'actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'"  Birmingham v. Omaha Sch. Dist., 298 F.3d 731, 734 (8th Cir. 2002) (alteration in original) (quoting Farrar v. Hobby, 506 U.S. 103, 111-12 (1992)).  "A party does not need to succeed on the entirety of the litigation to be considered the prevailing party under the IDEA; '[a] party prevails if it succeeded on any significant issue which achieved some of the benefit it sought.'"  Artichoker v. Todd Cty. Sch. Dist., No. 3:15-CV-3021-RAL, 2017 WL 2495197, at *2 (D. S.D. June 9, 2017) (alteration in original) (quoting Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1377 (8th Cir. 1996)).

In the first amended due process complaint, Grandmother claimed the District denied Student a FAPE and violated its child-find duties by failing to find Student eligible for special

---

[30] The statute further provides:  "Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."  20 U.S.C. § 1415(i)(3)(C).

education services and develop an IEP until March 2017.  [R. at 116]  Grandmother requested the "District to provide compensatory services, such as academic tutoring, counseling, and social skills training, to make up for the District's delay in finding [Student] eligible under the IDEA and the resulting harm, attorney's fees, and for such other and further relief as may be just and proper." [R. at 123]

The AHC found that the District:  (1) denied Grandmother the opportunity to meaningfully participate in the IEP process by failing to evaluate Student for OHI in April 2015; and (2) violated its child-find obligation when it failed to reevaluate Student shortly after receiving the IEE in November 2016.  [ECF No. 1-1]  In regard to the District's April 2015 procedural violation, the AHC ordered the District to evaluate Student for OHI.  [Id. at 30]  As to the District's violation of its child-find obligation in November 2016, the AHC ordered the District to provide Student "the equivalent of four school months of education in math and reading," or "at least 88 hours of education in math and 88 hours in reading." [Id.]  Additionally, the AHC specified that Student's compensatory education "shall include the recommendations contained in the IEE, including a functional behavior assessment, preferential seating, instruction in math and reading, and a research-based early intervention reading program." [Id.]

The AHC determined that the District's child-find violation denied Student a FAPE for approximately four months and granted Student four months' compensatory educational services in math and reading.  See Miener, 800 F.2d at 753 (ordering compensatory educational services is appropriate relief under the IDEA for the denial of a FAPE).  The AHC altered the legal relationship between the parties by requiring the District to provide Student compensatory services and granting Student a legal right previously denied him by the District.  See Birmingham, 298 F.3d at 734 ("This right to compensatory education suffices to make [the

plaintiffs] a 'prevailing party' entitled to attorneys' fees."). Student "would be directly benefited by such compensatory education, since it would repair the harm [he] suffered from being deprived of [his] educational rights."[31] Id. The Court therefore finds that Grandmother was the prevailing party.[32]

### 3. Reasonable Attorney Fees

Having found that Grandmother was the prevailing party at the administrative proceeding below, the Court must consider whether the amount of attorney fees sought is reasonable. Grandmother's counsel submitted declarations and itemized billing statements in support of the motion seeking $161,010. The District urges the Court to reduce Grandmother's fee request because: (1) she obtained minimal relief; (2) counsel's hourly rate is unreasonable; and (3) the number of hours for which she seeks reimbursement is unreasonable. [ECF No. 71] In her reply brief, Grandmother counters that: (1) counsel achieved an "excellent result" in the AHC proceeding; (2) counsel's hourly rate of $300 per hour is "reasonable and well within the market rate in St. Louis"; and (3) the amount of time billed by both of Grandmother's attorneys is reasonable. [ECF No. 76]

In determining the appropriate award of attorney fees, a court first calculates the lodestar, which provides an initial estimate of the value of the attorneys' services. R.M.M. by and through

---

[31] To the extent the District suggests that Grandmother was not the prevailing party because Student had not yet received the compensatory educational services to which he was entitled, the Court notes that the Eighth Circuit rejected a similar argument. Birmingham, 298 F.3d at 734 (parents did not lose their prevailing party status when they refused to allow compensatory education to begin).

[32] The District also argued that Grandmother was not the prevailing party because she did not receive most of the relief she sought. The Court will consider the degree of Grandmother's success when it calculates the amount of attorney fees. See Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs., 565 F.3d 1232, 1247 (10th Cir. 2009) (quoting Farrar, 506 U.S. at 114) ("[W]hile the 'magnitude of the relief obtained' is irrelevant for determining the prevailing party, the 'degree of the plaintiff's overall success goes to the reasonableness of a fee award.").

T.M. v. Minneapolis Pub. Schs., Special Sch. Dist. No. 1, No. 15-CV-1627 SRN/HB, 2017 WL 6453302, at *4–5 (D. Minn. 2017) (citing Hensley v. Eckerhart, 461 U.S. 424,  433 (1983)); see also Brittany O. v. Bentonville Sch. Dist., No. 5:15-CV-5020, 2018 WL 1369923, at *6 (W.D. Ark. Mar. 16, 2018).  The lodestar "is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates."  Paris Sch. Dist. v. Harter, 894 F.3d 885, 889 (8th Cir. 2018) (quotation omitted).

The lodestar "provides an objective basis on which to make an initial estimate of the value of a lawyer's services," but does not end the inquiry.  Hensley, 461 U.S. at 433.  Various considerations may lead a district court to adjust the fee "upward or downward," but many of these considerations will have been "subsumed within the initial calculation of hours reasonably expended at a reasonable rate."[33]  Id. at 434 & n.9.

    a.   Hourly rate

The District argues that the hourly rates of Grandmother's counsel, Margaret LaMore and Michelle Weltman, should be reduced.  [ECF No. 71]  The District asserts that $300.00 per hour is unreasonable because:  (1) the District's attorney and his law partner bill $250.00 per hour but have many more years' experience and "assume [more] risk" than Grandmother's counsel; and (2) Grandmother's counsel work for Legal Services of Eastern Missouri (LSEM), which "does not 'bill' clients in the sense that it expects to be paid for services provided."[34]  [Id. at 8]  In

---

[33] Those considerations include:  (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  St. Louis Fire Fighters Int'l Ass'n v. City of St. Louis, Mo., 96 F.3d 323, 332 n. 10 (8th Cir. 1996).

[34] In support of its claim that Grandmother's attorneys' hourly rates are unreasonable, the

response, Grandmother asserts that:  (1) an hourly rate of $300.00 is "reasonable and well within the market rate in St. Louis"; and (2) the Eighth Circuit recognizes the right of pro bono and legal services attorney to fee awards equivalent to private attorneys.  [ECF No. 76]

"The burden is on the moving party to provide evidence supporting the rate claimed." Wheeler v. Missouri Highway & Transp. Comm'n, 348 F.3d 744, 754 (8th Cir. 2003). Under the IDEA, any fee award must be based on "rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."  20 U.S.C. § 1415(i)(3)(C).

With her complaint for attorney fees, Grandmother submitted the declarations of her attorneys Ms. LaMore and Ms. Weltman.  [ECF Nos. 1-3, 1-4]  Ms. Lamore was lead counsel in this matter.  She stated in her declaration that she had worked as a juvenile officer for the 20th Circuit Juvenile Office in Union, Missouri from 2011 until 2013, when she joined the Children's Legal Alliance at LSEM.   [ECF No. 1-3]  During her time at LSEM, she had represented clients in more than 200 special education, due process, and school discipline cases in Missouri, primarily in the City of St. Louis.  [ECF No. 1-3]

In Ms. Weltman's declaration, she stated that she had worked in LSEM's Children's Legal Alliance since 2017.  [ECF No. 1-4]  Her prior experience included two years at the Law Offices of Thomas E. Kennedy, III in St. Louis, Missouri and three years at Land of Lincoln Legal Assistance Foundation.  [Id.]  When she worked at the Law Office of Thomas E. Kennedy, III she billed $300 per hour.  [Id.]

In support of her motion for summary judgment, Grandmother submitted the declarations of St. Louis civil rights attorneys John Amman and Thomas Kennedy, and a copy of the Missouri Lawyer's Weekly 2019 survey of billing rates.  [ECF Nos. 60-3, 60-4, 60-5]  Mr. Amman and

District presents only the affidavits of the District's counsel and his law partner, James Thomeczek.  [ECF Nos. 71-1, 71-2]

Mr. Kennedy declared that they were familiar with Ms. LaMore and Ms. Weltman and considered them highly experienced in the area of special education law.  Mr. Amman and Mr. Kennedy stated:  (1) that Ms. LaMore's and Ms. Weltman's hourly rates of $300.00 were comparable to similarly experienced attorneys in the St. Louis metropolitan area[35]; and (2) the hours for which they seek compensation are fair and reasonable.

The District urges the Court to reduce Grandmothers' attorneys' hourly rates because they work for LSEM, which neither "bills" its clients nor "assume[s] the same risk that attorneys in private practice assume if they take a case on a contingency basis."  [ECF No. 71 at 8-9]  The Eighth Circuit has clearly stated, however, that "[t]he fact [the plaintiffs] were represented by publicly funded counsel does not affect their right to fees."  Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1377 (8th Cir. 1996).  See also A.J. by L.B. v. Kierst, 56 F.3d 849, 864 (8th Cir. 1995).

In a recent IDEA case, a court in this District considered evidence of "billing rates of $200-$350 for 'attorneys' or 'associates' practicing employment or civil rights law in the St. Louis metropolitan area and $350-$500 for 'partners' practicing employment or civil rights law in the St. Louis metropolitan area."  D.L. v. St. Louis City Public Sch. Dist., No. 4:17-CV-1773 RWS, 2019 WL 1359282, at *2 (E.D. Mo. Mar. 26, 2019) ("D.L.").  The court awarded the plaintiff's attorneys their requested hourly rates of $300 per hour and $400 per hour.  Id.  The District has not presented any circumstances that would distinguish this case from D.L. for the purposes of determining appropriate hourly rates under Section 1415(i)(3)(C).  The Court finds that hourly rates of $300 for Ms. LaMore and Ms. Weltman are appropriate and consistent with

---

[35] In regard to hourly rates, Mr. Kennedy stated that:  he charged fee-paying clients $400 per hour; his partner with eight years' experience charged $300 per hour; and his associate with one year's experience charged $200 per hour.  [ECF No. 60-4]

the rates billed by lawyers of similar experience for similar work in the St. Louis region.

b.   Hours billed for work at administrative level

The District contends that the Court should reduce Grandmother's attorney fees because her attorneys expended an unreasonable number of hours on a case that was "neither novel nor complex by IDEA standards." [ECF No. 71 at 8]  More specifically, the District disputes as excessive and/or redundant the amount of time Grandmother's attorneys expended for:    (1) drafting and filing the amended due process complaint (31.08 hours); (2) both attorneys' participation in the AHC hearing (29.9 hours); (3) and drafting the post-hearing brief (111.2 hours). [ECF No. 71]

"In calculating the lodestar, courts must determine whether the hours claimed were 'reasonably expended.'" Paris Sch. Dist., 894 F.3d at 889 (citation omitted).  Courts "should exclude … hours that were not 'reasonably expended,'" such as excessive or redundant hours. Hensley, 461 U.S. at 434 (citation omitted).  "Trial judges 'should weigh the hours claimed against [their] knowledge, experience, and expertise of the time required to complete similar activities." Paris Sch. Dist., 894 F.3d at 889 (quoting Gilbert v. City of Little Rock, Ark., 867 F.2d 1063, 1066 (8th Cir. 1989)).  "A party [in a civil rights action] is not entitled needlessly to accumulate exorbitant legal fees with the expectation that the losing party will be called upon to pick up the entire tab." Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action, 558 F.2d 861, 871 (8th Cir. 1977).

First, the District argues that Grandmother's counsel's request for compensation for the 31.8 hours spent drafting and filing the amended due process complaint was unreasonable because "[t]here was no clear reason for filing the amended due process complaint" and "the hours spen[t] drafting it are grossly excessive."  [ECF No. 71 at 8]  Grandmother does not

address this claim.

The IDEA provides that a "party may amend its due process complaint notice only if:  (I) the other party consents in writing to such amendment…; or (II) the hearing officer grants permission…."  20 U.S.C. § 1415(c)(2)(E)(i).  Grandmother filed a motion for leave to amend the due process complaint stating that, at the time of the original due process complaint, she possessed limited documentation regarding Student's behavior and Peabody's attempts to implement general education interventions.  [R. at 94]  She explained that she had since received from the District email correspondence, behavior reports, and other documentation "which further clarified the factual circumstances of the case."  [Id.]  Additionally, Grandmother sought leave to amend the due process complaint to "further clarify the factual and legal issues remaining in the case."[36]  Finally, Grandmother averred that the District "agreed to consent to the amendment attached to this motion on the condition that the case is continued to allow [the District] time to attempt to resolve the complaint and prepare for a hearing on the amended complaint."  [Id.]  The AHC granted Grandmother's motion for leave to file the amended due process complaint.  [R. at 124]

In the amended due process complaint, Grandmother significantly developed the factual allegations, lengthening this section from four and a half pages to seventeen pages.  Not only did the amended due process complaint clarify the issues presented, it developed the legal arguments by including supporting facts and citations to statutory authority and case law.  The Court recognizes that amending the due process complaint necessitated a significant amount of work and Grandmother ultimately prevailed on the amended due process complaint.  While such

---

[36] Grandmother explained that, because the District found Student "eligible for special education services in March 2017, after the filing of the initial [due process] complaint, the remaining issues in the case do not involve whether [Student] should be eligible under the IDEA, but rather *when* he should have been found eligible under the IDEA."  [R. at 94 (emphasis in original)]

services entitle an award of fees, the Court nevertheless finds that the 31.08 hours counsel claims to have expended to be excessive.  Accordingly, the Court reduces the reasonable time expended to a total of 21.08 hours.

Next, the District argues that Grandmother should not receive attorney fees for "the luxury of having two attorneys participate" in the AHC hearing because the "issues in this case were neither novel nor complex by IDEA standards."  [ECF No. 71 at 8]  In response, Grandmother asserts that it was reasonable for both Ms. LaMore and Ms. Weltman to bill their time for the AHC hearing because "both attorneys made distinct contributions to the case." [ECF No. 76 at 7]  Grandmother explains that, because she bore the burden of proof before the AHC, her attorneys "called significantly more witnesses and entered significantly more exhibits into evidence" than the District over the course of the two-day hearing.[37]  [Id. at at7-8]

The Eighth Circuit has held that a court may not "reduce attorneys' fees solely on the basis that multiple attorneys helped to secure a prevailing party's success."  Kierst, 56 F.3d at 864.  However, "a court may reduce attorney hours, and consequently fees, for inefficiency or duplication of services in cases where more than one attorney is used."  Id.  "A fee award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case."  Trbovich v. Ritz-Carlton Hotel Co., 166 F.R.D. 30, 32 (E.D. Mo. 1996).

---

[37] Grandmother further explains:
> For example, [Grandmother] called seven witnesses, three of whom were considered 'expert witnesses.' In addition, [Grandmother] entered 31 exhibits into evidence, totaling more than 720 pages.  Both Ms. LaMore and Ms. Weltman contributed equally to the questioning of Grandmother and [the District's] witnesses.  It would have been difficult for one attorney alone to prepare and question three separate expert witnesses over the course of a two-day hearing.

[R. at 7-8]

While the facts and legal issues in this case were neither novel nor complex, the many exhibits and witnesses warranted the involvement of more than one attorney.  Ms. LaMore and Ms. Weltman both contributed to and participated in the hearing.  This is not a situation where the case was "overstaffed."  The Court concludes that the hours submitted by Grandmother's counsel for time expended at the AHC hearing are reasonable and not duplicative.

Finally, the District acknowledges the "extensive record to be addressed" in the post-hearing brief but argues that 111.2 hours spent drafting it was unreasonable.[38]  [ECF No. 71 at 8] Grandmother counters that drafting the 69-page post-hearing brief "took a significant amount of time."  [ECF No. 76]  She further states that her counsel "exercised considerable judgment by only billing the time spent by Ms. LaMore and Ms. Weltman" and excluding from the fee request compensation for time expended by other LSEM attorneys and a law student intern.  [Id.]

Grandmother's attorneys spent 111.2 hours preparing proposed findings of fact, conclusions of law, and legal briefs totaling 69 pages.  Drafting this post-hearing brief required counsel to summarize approximately 500 pages of transcript and 750 pages of exhibits.  The Court recognizes that the work involved in summarizing the extensive record and briefing the legal arguments was considerable.  However, the legal arguments were neither novel nor complex, and the Court agrees that 111.2 hours was excessive.  Accordingly, the Court reduces the reasonable time expended to a total of 86.2 hours.  Based on the foregoing, the lodestar amount is as follows:  341.4 hours x $300.00 per hour = 102,420.00.

### c.  Degree of success at the administrative level

Calculation of the lodestar does not end the inquiry.  The District argues that Grandmother's attorney fees should be reduced because:  (1) Grandmother "did not receive most

---

[38] After the hearing, the AHC ordered counsel for both parties to file proposed findings of fact, conclusions of law, and legal briefs.  [R. at 133]

of the relief she sought"; and (2) as a result of the AHC proceeding, Student "received little more than what the District had offered" to settle the matter.  [ECF No. 71]  Grandmother states that the AHC awarded Student a "significant amount" of compensatory services, which was "nearly three times the relief offered in settlement[.]"  [ECF No. 76 at 6]  She also asserts that she was substantially justified in rejecting the District's single settlement offer because it did not include attorney fees.  [ECF No. 60 at 14]

"In awarding attorney fees, 'the most critical factor is the degree of success obtained.'" Wheeler, 348 F.3d at 754 (quoting Hensley, 461 U.S. at 436).  "If the plaintiff's success is limited, [s]he is entitled only to an amount of fees that is reasonable in relation to the results obtained."  Jenkins by Jenkins v. State of Mo., 127 F.3d 709, 716 (8th Cir. 1997) (citing Hensley, 461 U.S. at 440).  "The award of fees to a prevailing party is intended to 'encourage prompt resolution of meritorious claims and to discourage unnecessary litigation.  This policy rationale … is served by declining to award fees when litigation yields only relief that in all probability was attainable without the time and expense of adversarial proceedings.'"  Brittany O., 2018 WL 1369923, at *8 (alteration in original) (quoting Peter v. Jax, 187 F.3d 829, 837-38 (8th Cir. 1999)).

As previously discussed, Grandmother claimed in her amended due process complaint that the District denied Student a FAPE and violated its child-find obligation by failing to find Student eligible for special education services and develop an IEP until March 2017.  Although Grandmother alleged that the District erred in failing to find Student eligible for special education services in April 2015, the AHC found only a procedural violation and not a substantive violation.  The AHC also rejected Grandmother's argument that the District violated its child-find obligation and denied Student a FAPE from April 2015 until March 2017, finding

44

instead that the District denied Student a FAPE for the four-month period of time between November 2016 and March 2017.  In light of Grandmother's partial success, the Court finds that a reduction in fees is appropriate.  See e.g., Ogawa v. St. Paul Pub. Sch., Indep. Sch. Dist. No. 625, No. 17-1398 ADM/DTS, 2018 WL 354658, at *8 (D. Minn. Jan. 10, 2018).  The Court will reduce the lodestar amount of $102,420 by 20 percent, or $20,484.00, to a total of $81,936.00. [39]

The District also asserts that Grandmother's attorney fees should be reduced because the District immediately provided her the primary relief she requested (eligibility evaluation of Student and creation of an IEP) and offered to provide Student compensatory services.  [ECF No. 71]  For her part, Grandmother argues that: (1) she was "substantially justified" in rejecting the District's "single offer of settlement" because it did not include attorney fees; and (2) the AHC awarded her greater relief than the District offered.  [ECF No. 60]

Under 20 U.S.C. § 1415(i)(3)(D)(i)(III), attorney fees "may not be awarded" if a court finds that "the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement."  Notwithstanding that prohibition, subsection (E) provides that "an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer."  20 U.S.C. § 1415(i)(3)(E).  Courts have found that a parent is "substantially justified" in rejecting settlement offers that include insufficient or no attorney fees.  See e.g., Rena C. v. Colonial Sch. Dist., 890 F.3d 404, 420 (3d

---

[39] In her petition for attorney fees, Grandmother seeks compensation for attorney work performed at the administrative level and in drafting the fee petition for this Court.  [ECF No. 1]  However, Grandmother does not separate the amount of fees attributable to the AHC proceedings from those attributable to drafting the fee petition.  "[T]rial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."  Miller v. Bd. of Regents of Univ. of Minn., 402 F.Supp.3d 568, 594 (D. Minn. 2019) (quoting Fox v. Vice, 563 U.S. 826, 838 (2011)).  The Court therefore does not exclude fee-petition fee hours from the lodestar total when performing this calculation.

Cir. 2018), cert. denied, 139 S.Ct. 244 (2018); Ogawa, 2018 WL 354658, at *7; McNeil v. District of Columbia, 342 F.Supp.3d 156, 164 (D. D.C.  2018); Daniel v. District of Columbia, 174 F.Supp.3d 532, 545-46 (D. D.C. 2016).

In support of her motion for summary judgment, Grandmother provides a copy of the District's April 2017 settlement offer, in the form of a "Settlement Agreement and Release." [ECF No.60-7]  In relevant part, the District offered Student:  (1) private placement through the end of the 2017-2018 school year; and (2) either $2,000 toward private tutoring or 60 hours of tutoring provided by the District.  [Id. at 2-4]  The offer did not include attorney fees.

The Court need not determine whether the AHC-awarded relief was more or less favorable than the District's settlement offer because Grandmother's rejection of the offer was substantially justified.  See Ogawa, 2018 WL 354658, at *7 (parents were substantially justified in rejecting settlement offer where "certain issues remained unresolved that prevented settlement, including the amount of attorneys' fees and a consent decree.").  The District's offer included no compensation for attorney fees and costs.  The Court will not reduce the award of attorney fees based on Grandmother's rejection of the District's offer and decision to proceed with litigation.  Grandmother is entitled to $81,936.00 in attorney fees for work at the administrative level and drafting the fee petition.

d.  Hours billed for District Court proceedings

In her motion for summary judgment on her complaint for attorney fees and costs, Grandmother requests $161,010.00 in attorney fees.  [ECF Nos. 59, 60]  Although Grandmother fails to separate the hours spent at the administrative level and drafting the fee petition from those spent litigating this matter in this Court, the Court deduces from the "Plaintiff's Updated Attorney's Fees and Costs," that Grandmother seeks compensation for an additional $48,090,

representing 160.3 hours billed by Ms. LaMore for her work in this Court.  [See ECF No. 60-2]

In regard to the hours worked after the filing of Grandmother's complaint for attorney fees and costs, the District challenges only the 49.4 hours counseled billed for work on Grandmother's unsuccessful motion to dismiss the District's counterclaim for lack of subject matter jurisdiction and failure to state a claim.  [ECF No. 71 at 8]  The District asserts that Grandmother's motion to dismiss "served no purpose other than to waste time and resources and to delay resolution of the case."  [Id.]  Grandmother does not address the District's claim that she is not entitled to attorney fees for the hours spent on her unsuccessful motion to dismiss.  [See ECF No. 76]

Having reviewed the District's argument and Grandmother's counsel's billing records, the Court agrees with the suggested reduction.  The Court denied Grandmother's motion to dismiss [See ECF No. 29], and it is inappropriate to award relief for work dedicated to that motion.  See, e.g., D.L., 2019 WL 1359282, at *2 (denying attorney fees for time spent on matters that were either unnecessary to the relief obtained or unsuccessful).  Accordingly, the Court reduces the 160.3-hour total by 49.4 hours, for a total of 110.9 hours.

The District does not challenge the remaining 110.9 hours Grandmother's counsel billed for her work litigating in this Court.  A review of Ms. LaMore's time records reveal that she spent time on tasks relating to alternative dispute resolution and the drafting of an:  answer to the District's counterclaim; motion to unseal the administrative record; motion for summary judgment and statement of uncontroverted material facts; and reply memorandum in support of motion for summary judgment.  [ECF No. 60-2]  Given the large administrative record in this case and the considerable work necessitated by the District's unsuccessful counterclaim, the Court finds that 110.9 hours, or less than three weeks' work, is a reasonable amount of time for

Grandmother's counsel to spend litigating her case in this Court.  Accordingly, the Court awards Grandmother additional attorney fees as follows:  110.9 hours x $300.00 per hour = $33, 270.00.

### 4.  Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the District's motion for judgment on the administrative record [ECF No. 62] is **DENIED**.

**IT IS FURTHER ORDERED** that the District's motion for summary judgment on Grandmother's complaint for attorney fees [ECF No. 65] is **DENIED**.

**IT IS FURTHER ORDERED** that Grandmother's motion for judgment on the administrative record [ECF No. 59] is **GRANTED**.

**IT IS FINALLY ORDERED** that Grandmother's motion for summary judgment on her complaint for attorney fees and costs [ECF No. 59] is **GRANTED** in part and **DENIED** in part. Defendant shall pay Grandmother $115,206.00 in attorney fees and $1,169.95 in costs, for a total of $116,375.95.  A separate judgment in accordance with this Memorandum and Order is entered this same date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of June, 2020